Argued July 13, reversed and remanded July 30, 1926.

## A. McMILLAN v. JAMES B. DICKOVER.

(248 Pac. 154.)

**Frauds, Statute of.**

1. Intention of parties ascertained from words used and surrounding circumstances controls in determining whether promise was original or collateral.

**Frauds, Statute of.**

2. Where language is ambiguous and intention of parties not clear, question whether promise was original or collateral is for jury; otherwise, for court.

**Frauds, Statute of.**

3. Contractor's oral promise to pay for materials furnished subcontractor is within statute, unless seller relies exclusively on credit of contractor.

**Frauds, Statute of.**

4. Evidence *held* to show contractor's oral promise to pay · for materials furnished subcontractor was collateral only and within statute.

**Frauds, Statute of—Evidence of Offer to Pay Part of Account if Released from Balance Does not Tend to Show That Liability was Other Than That of Guarantor.**

5. That contractor offered to pay amount due for materials furnished subcontractor on particular job if seller would release him from liability on balance of subcontractor's account does not tend to prove that his liability under oral agreement was other than that of guarantor.

Frauds, Statute of, 27 **C. J.**, p. 132, n. 14, p. 134, n. 15, p. 135, n. 17, 18, p. 140, n. 60, p. 142, n. 65, p. 386, n. 53, 54, p. 390, n. 3, 4.

From Multnomah: ROBERT G. MORROW, Judge.

Department 2.

This is an action to recover for goods alleged to have been sold and delivered to defendant, between and including August 1, 1921, and October 26, 1921,

1. See 25 R. C. L. 483.
2. See 25 R. C. L. 490.
4. See 25 R. C. L. 491.

amounting in the aggregate to the agreed value of
$484.50. Defendant appeals from the judgment entered
on verdict in favor of plaintiff.

REVERSED AND REMANDED.

For appellant there was a brief over the name of
*Messrs. Murdoch & Crum,* with an oral argument by
*Mr. Nicholas Jaureguy.*

For respondent there was a brief and oral argu-
ment by *Mr. Robert R. Rankin.*

BELT, J.—The primary question involved is
whether there is any evidence to support the verdict of
the jury. Plaintiff's right to recovery is predicated
upon an alleged oral promise made by defendant to pay
for certain building materials furnished and delivered
to a third person. If the promise is collateral, it is
within the statute of frauds and plaintiff cannot pre-
vail; but if there is evidence tending to show an origi-
nal obligation on the part of defendant, the finding
of the jury in reference thereto is conclusive.

1, 2. In determining whether a given state of facts
constitutes an original or a collateral promise, the
intention of the parties controls, and this must be
ascertained from the words used in making the prom-
ise, the situation of the parties, and all of the circum-
stances surrounding the transaction: *Masters et al.* v.
*Bidler et al.,* 101 Or. 322 (198 Pac. 912, 199 Pac. 920);
*Mackey* v. *Smith et al.,* 21 Or. 598 (28 Pac. 974); 25
R. C. L. 489. Where the language used by the parties
is ambiguous and the intention is not clear, it is a
question of fact for the jury as to whether a promise
is original or collateral: *Masters et al.* v. *Bidler et al.,*
*supra; Mackey* v. *Smith et al., supra.* As stated in
25 R. C. L. 490:

"Where the language used, together with the surrounding facts and circumstances, makes it doubtful whether the parties intended by the promise to create an original or a collateral obligation, the intention should be determined by the jury."

However, when the facts are undisputed and but one reasonable inference can be drawn therefrom, it becomes a question of law for the court to determine: 27 R. C. L. 390; *Breidenbach et al.* v. *Upper Valley Orchards Co.*, 57 Mont. 247 (187 Pac. 1008); *Masters et al.* v. *Bidler et al., supra.*

Justice Brewer, in *Davis* v. *Patrick*, 141 U. S. 479 (35 L. Ed. 826, 12 Sup. Ct. Rep. 58, see, also, Rose's U. S. Notes), says:

" * * the real character of a promise does not depend altogether upon the form of expression, but largely on the situation of the parties; and the question always is, what the parties mutually understood by the language, whether they understood it to be a collateral or a direct promise."

Courts are concerned with substance rather than form.

3. The primary inquiry is: To whom was credit extended at the time of the sale? Did plaintiff rely exclusively upon the credit of defendant or did he merely look to him as a guarantor? Shaw, C. J., in *Cahill* v. *Bigelow*, 18 Pick. (Mass.) 369, quoted with approval in *Mackey* v. *Smith et al., supra*, thus states the test:

" 'Was the credit given to the person receiving the goods? If it was, then such promisor is a guarantor only, undertaking to pay another's debt. If no credit were given to the person receiving the goods, then the promisor is himself debtor for goods sold to him and delivered to another by his order.' "

In *Brown* v. *Weber*, 38 N. Y. 187, it is stated:

"The test to be applied in every case is, whether the party sought to be charged is the principal debtor, primarily liable, or whether he is only liable in case of the default of a third person; in other words, whether he is the debtor, or whether his relation to the creditor is that of surety to him for the performance, by some other person, of the obligation of the latter to the creditor."

4. In the light of the law above stated, let us examine the evidence. Plaintiff, who was engaged in business in the City of Portland, had for many years sold building materials to defendant, a general contractor, and to one Paul Schiewe, who was also a builder. At the time in question defendant had contracts to build several houses and had subcontracted certain portions of the work to Schiewe. Schiewe was heavily indebted to the plaintiff and the latter was becoming somewhat concerned about his ability to pay. Plaintiff testified that, in his office on June 21, 1921, the following conversation with defendant occurred:

"When I came into the office I stepped up by the desk and waited until he got through. Then I spoke to Mr. Dickover and we talked about the business. He asked me if Paul Schiewe was getting goods from us for his jobs. I told him he was. He asked me how he was about paying and I told him he was very slow, it was awful hard to get money out of him and I was figuring on stopping furnishing him any more goods. He said, 'I will see you get your money on the material sent to my jobs.'"

B. E. Teschner, employed by plaintiff as an order clerk, in referring to the above conversation, testified:

"I remember plainly Mr. Dickover coming in. He inquired about Mr. Schiewe's account, and Mr. Mc-

Millan told him it was very. slow and he thought he would cut him out. The conversation led on, and then Mr. Dickover says, -'Well, * *—regarding the lien notices, mail them to me.' He says, 'I will see you are protected on the .jobs.' ''

Charles D. Fox, employed by plaintiff as book-keeper, stated that he heard defendant say:

"He would see that the bills were paid for the materials sent on his jobs."

O. C. Fields, a salesman for plaintiff, thus gave his version of the talk had between the parties:

"Mr. Dickover asked him, he says, 'How is Paul paying his bills, Mack?' 'Pretty slow.' 'Well,' he says, 'I will see that you don't lose anything on any of the material that goes on any of my jobs.' ''

The record discloses the following cross-examination of plaintiff:

"Q. Why did you send him bills?

"A. Well, the bills were made out to him when he ordered the goods.

"Q. Because you thought he was your debtor, you—

"The Court: (Interrupting.) Just a minute; that is a statement on your part. You say 'Because you thought he was your debtor.' (To Witness.) Did you send them to him because you thought he was the debtor or for some other reason?

"A. He was a debtor, yes.

"Mr. Jaureguy: Q. When you sold these goods to him, you were selling them, at least partly, on his credit?

"A. *Partly on his credit,* but Mr. Dickover—we sent out the goods as he ordered them from these jobs, and we went after him for the money on them, too. Mr. Dickover one time told me that he was giving Schiewe quite a lot of money, and to go after him for these bills, and I did go after him pretty hard and tried to get it from him. * *

"Q. You say you attempted also to collect these bills from Mr. Dickover?

"A. Yes, sir.

"Q. Why did you try to collect them from Mr. Dickover?

"A. He told me he would see the bills were paid, and we sent him these invoices and we expected to get the money from him, *if Mr. Schiewe didn't pay it,* but we tried our best to get the money before from Mr. Shieve first.

"Q. Did you think that from that statement Mr. Dickover meant to guarantee the payment of these goods?

"A. We understood he would protect us on them.

"Q. He would protect you if Schiewe didn't pay?

"A. Yes, sir.

"Q. From Mr. Dickover's language you understood that he said if you could not collect from Mr. Schiewe he would pay it?

"A. That was the idea exactly, he would hold enough money out of Schiewe's—whatever he owed Schiewe, or what arrangement he made, to pay the bills, *if Schiewe didn't pay them.*"

The goods sold were charged on the books of the plaintiff to the account of Schiewe and numerous attempts were made to collect from him. While this is not conclusive · (*Mackey* v. *Smith et al., supra*) it is strong evidence of the fact that the plaintiff, in selling the building material, relied upon the credit of the person in whose name the account was carried: 25 R. C. L. 491, and cases in valuable note, 15 L. R. A. (N. S.) 224. Especially is this true since the amounts charged for the building materials delivered in the "Dickover jobs" were not segregated in the book account of Schiewe and various payments were made by the latter to plaintiff The explanation given by plaintiff as to the manner of charging these sales on his books does not refute, but rather substantiates

defendant's contention that the former was looking primarily to Schiewe for payment.

5. After careful consideration of the entire transcript of evidence, we think the only reasonable inference to be drawn from the undisputed facts is that the plaintiff looked upon defendant as a guarantor of payment for goods sold and delivered to Schiewe. At least the evidence is conclusive that credit was not extended exclusively to the defendant, and this is fatal to plaintiff's cause: *Masters et al. v. Bidler et al., supra.* Evidence that the defendant offered to pay the amount due for material furnished on one of the jobs on which Schiewe was working as subcontractor, if plaintiff would release him from liability on balance of account, does not tend to disprove the contention that defendant's liability, if any, must be predicated upon that of a guarantor.

Assuming that the promise was made by defendant in the language attributed to him by plaintiff and his witnesses, it was in the nature of a collateral obligation and therefore comes within the statute. Defendant's motion for a directed verdict should have been allowed: *Masters et al. v. Bidler et al., supra.*

It follows that the judgment is reversed and the cause is remanded, with directions to enter an order of dismissal.

REVERSED AND REMANDED, WITH DIRECTIONS.

McBRIDE, C. J., and BEAN and BROWN, JJ., concur.